IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

FILED
AUG 1 2001
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA

DAVIES RAIL AND MECHANICAL WORKS,
INC.

      Plaintiff,

v.                          CV 99-PT-776-E

PELL CITY INDUSTRIAL SERVICES,
INC.

      Defendant.

ENTERED
AUG 1 2001

## FINDINGS OF FACT
## AND
## CONCLUSIONS OF LAW

This cause came on to be heard at a bench trial on July 23-24, 2001.

### Facts

The plaintiff was awarded a U. S. Army contract to remove and replace overhead crane rails in three bays of a building at Anniston Army Depot. The plaintiff entered into a subcontract with the defendant to perform the most substantial part of the labor of the primary contract. There were other subcontractors and the plaintiff was to provide on location supervision and management; heavy equipment and equipment operators; and materials and supplies. The defendant was to provide journeyman labor, supervision and necessary hand tools. The initial contemplation of both parties was that the job could start on or about February 11, 1999 and be completed on or about March 1, 1999.

The court finds that during the contract negotiations representatives of the plaintiff represented to the defendant (which had earlier suggested a contract price) that the work would require less men than the defendant had based its price on. The defendant then reduced its price

55

substantially from $180,000 plus to $98,600. While the court does not find that the defendant could reasonably rely on these representations (the defendant had visited the job site and observed the work to be done) with regard to establishing the contract price, the representations were a factor in some of the initial start-up delay problems.

The defendant started the job on or about February 11, 1999 and left the job on or about February 28, 1999, after a dispute with the plaintiff over progress payments. The initial critical issue is which party, as of February 28, 1999, had or had not substantially breached the contract by a lack of substantial performance. The court finds that, as of February 28, 1999, the defendant had in good faith substantially performed under the contract. The court finds, however, that the plaintiff had not substantially performed because it had not made and did not tender substantial amounts of progress payments when due.

The following problems on the job arose between February 11 and February 28, 1999:

(1) The defendant attempted to begin construction with too few workers. This was, however, remedied early on by diligent effort of the defendant. The parties at least equally share responsibility for this under-manning; the plaintiff for its representations, the defendant for its unjustified reliance. The court does find that the plaintiff played down the number of workers needed and then, almost immediately, complained of the same number who appeared as being too small.

(2) The plaintiff who was to provide equipment to lift the rails, etc. did not, early on, provide proper "cherry pickers," and, in some circumstances, operators.

(3) Early in the construction period, the plaintiff's representative, Larry Castanado, over estimated the amount of rail which could be removed and replaced in time for the Army to have

use of its overhead cranes. The plaintiff, at least, shares responsibility for this problem, probably the major responsibility. This resulted in hurried installation of rail, perhaps causing some other problems.

(4) The plaintiff was responsible for providing "clips" when old clips could not be used. The duty to supply clips carried with it the duty to anticipate the number needed and to have them available. The underestimation of needed clips was substantially caused by the need for extra clips resulting when spliced rail joints were replaced by welded joints. Rather than to recognize the true cause of the problem, the plaintiff tended to fault the defendant.

(5) The plaintiff failed to supply some proper new bolts required for the new rails. This resulted in some duplication of bolt installation.

(6) There was a problem with some removed bolts and nuts falling. While it caused no substantial problem, it did cause the Army to complain and briefly delay the job. The parties had mutually agreed on how the nuts and bolts would initially be dropped and share responsibility. The problem was remedied.

(7) The forklift accident was of _no_ consequence in the total picture.

(8) The dropping of a rail because of inadequate spreaders and "dogs" (clamps) was, at least, equally caused by the parties. The plaintiff should have had greater knowledge.

Most of the problems listed above are mere finger pointing and window dressing for what led to the ultimate dispute. The real dispute resulted because the plaintiff failed to timely make progress payments as required by its contract with the defendant. As of February 27, 1999, the defendant had completed somewhere between 60% and 80% of its contracted for performance and was reasonably on schedule to complete its performance in a timely manner. It was to receive an approximate $6,000.00 bonus if its completed the work by March 1, 1999. As of

3

February 27, 1999, the defendant had been paid one ten percent "mobilization"payment and one twenty percent progress payment. It was entitled to, at least, two additional twenty percent payments which the plaintiff refused to pay. The court concludes that was a substantial breach of performance by the plaintiff. The defendant was due to have been paid a total of at least 70% of the contract price of $98,200.00 (10% plus 3 20% payments). It had been paid 30%. Plaintiff's purported basis for refusing to make the agreed upon progress payments, other than perhaps the matters address in (1) through (8) above which provided no reasonable basis, are two-fold.

First, the plaintiff claims that it had reservations about the rail alignment and would not pay the defendant until the defendant had agreed to participate in a laser alignment process and any resulting realignment. Second, the plaintiff claims that it had bona fide concerns about whether the bolts installed in the new rails had been properly torqued. As to the alignment issue, there is no evidence that there was any noticeable alignment problem as of February 28, 1999. The Army had been operating the overhead cranes, on a daily workday basis, on the newly installed rail and there had been no problems. The <u>plaintiff</u> had the obligation under its contract with the Army to do laser level and parallelism laser checking in conformity with CMMA standards. The defendant, while generally bound by the Army specifications, had agreed with the plaintiff only to "align with piano wire. Laser alignment will be per [plaintiff]." There is substantial evidence that at least some piano wire checking was done. There is no evidence that there was an alignment problem resulting from any failure to do piano wire checking.

There is a dispute between the parties as to who would have had the responsibility, at the end of the job, to do any realigning which might result from a laser check. The defendant, however, was not required to do laser aligning during performance and the issue of who might

4

have had to do physical realignment resulting from a laser check is a moot point, because the plaintiff substantially failed to perform and ended the contract.

A similar circumstance existed with regard to the bolt torque situation. There is no question that the defendant had the ultimate responsibility for obtaining proper torque of the bolts. That, however, had not caused a problem as of February 28, 1999. The fact that the defendant had acted reasonably with regard to bolt torque is borne out by the fact that the contractor who was hired to torque the bolts after the defendant left, using the same method employed by the defendant, failed twice to properly torque the bolts. The proper torque was accomplished only after the proper equipment was used. This could have ultimately been accomplished by the defendant at the completion of the job. Again, the issue was mooted by a premature substantial failure to perform by the plaintiff.

With regard to the percentage of completion of the work as of February 28, 1999, perhaps the most convincing evidence is the statement of the plaintiff's president in a March 1, 1999 letter to the Army in which she generally states that the work, other than alignment, is 75% complete. The letter states that four of the six crane rail lines are 100% complete, another is 70% complete and another 0% complete. This detailed analysis suggests a 78.33% completion. The completion figures are consistent with the estimates of defendant's representative, Donald Burch, who testified that there were two lines 100% complete, two lines which were 80% complete and two lines 60% complete. This represents a total of 80% completion. The court found Burch to be a credible witness.

The court makes the following additional and explanatory findings:

(1) It should have been understood that the work was to be done by CMMA standards. However, the plaintiff had some responsibility for explicating this and assisting in its

implementation.

(2) James A. Davies, the plaintiff's Vice-President, testified that the laser check was due to be the <u>last</u> process in the job.

(3) The contract was awarded to the plaintiff in August 1998. It had over five months to investigate, plan and prepare. It only learned of the clips situation and bolt sizes as the job progressed.

(4) Plaintiff's president testified that she told the defendant she would make the progress payments if the defendant met conditions, at least a portion of which were not then required by the contract. Also see Plaintiff's Exhibit 37.

(5) The defendant did not take its tools, etc. when it left on February 28, 1999. It was prepared to return if the progress payments had been made. It left its spreaders and clamps to accommodate the plaintiff's completion of the job. The plaintiff took them to Texas. They have a value of $3,000.00

(6) The plaintiff finished the job on time and was not charged any penalty. As of February 28, 1999, the defendant had plenty of time to finish the job if plaintiff had not rushed to judgment. Defendant would have had to pay a penalty if it had not completed the job on time.

(7) The welding which was not approved was not approved because the finishing touches had not been done. There was no substantial problem with the "stops."

(8) The conditional progress payment that the plaintiff offered was not the full amount due.

(9) If plaintiff had paid the defendant its due progress payments and defendant had stayed on the job, it could have completed the job, including any torque work and alignment work which was its responsibility within a week, well within plaintiff's time limit.

(10) On at least two occasions the cranes furnished by plaintiff broke down.

(11) Ken Lee, the Army representative, spent 100% of his work time on this job. He was a credible witness. He knew of no alignment problems during the construction. The Army cranes could work.

(12) In Lee's judgment 80 man hours would have been sufficient to cure any torque problems. Lee felt that the torque problem was caused by the type tool used. There is no evidence that any plaintiff representative suggested using another tool, even before the torque work failed twice after the defendant left.

(13) On Exhibit 37, the plaintiff states that the meeting of February 17, 1999 resulted from "past problems." Lee testified that the meeting was called at least partly because the clip shortage had caused a slow down in work. Part of the discussion at the meeting dealt with keeping supplies on hand, a responsibility of the plaintiff. Plaintiff's own chart (Exhibit 37) does not suggest that the defendant had not substantially performed as of the last date indicated.

(14) Lee felt that the realignment after the laser check was "minimal." There was some parallelism alignment which defendant's piano wire check (its obligation) would not detect.

(15) Lee observed only four problems during construction: (a) slow start because of typical learning curve; (b) first week removed more rail than could be replaced. (This decision was at least shared by the plaintiff); (c) incorrect bolts supplied by plaintiff; and (d) his concerns about how the _plaintiff_ represented the fact that "staggering" clips and bolts was satisfactory.

(16) Lee heard no discussion about alignment during the job. The only discussion of torque that he was aware of was when _he_ suggested that the tool was likely not sufficient.

(17) The decision to throw bolts down was at least shared by the parties.

### Conclusions of Law

As the court has indicated, the primary initial issue is who had and had not substantially performed. Substantial Performance, a fact-intensive inquiry, "does not mean a full and exact performance in every slight and unimportant detail, but the performance of all important parts." Brabham v. American Nat'l Bank, 689 So.2d 82, 87 (Ala. Civ. App. 1996). A party who has substantially fulfilled the main purpose of the contract may enforce the other party's promise to pay. Medical Clinic Bd. v. Smelley, 408 So.2d 1203, 1206 (Ala. 1981); Brunner v. Hines, 324 So.2d 265, 267 (Ala. 1976). The court is satisfied that the defendant made an honest effort to perform and did substantially perform. The plaintiff acted prematurely in failing to make substantial progress payments. See Vinegar Bend Lumber Co. v. Soule Steam Feed Works, (Ala. 1913); Cobbs v. Fred Burgos Const. Co., 477 So.2d 335 (Ala. 1985); Brunner, 324 So.2d at 269-270. The failure to make substantial progress payments was a matter of essence which excused the defendant from further performance because the plaintiff had not substantially performed. Since the defendant had substantially performed, the plaintiff has damaged the defendant and the defendant is entitled to recover on its counterclaim.

With regard to its negligence claim, the plaintiff cites Pittman v. Mast Advertising Publishing, Inc., 619 So.2d 1377, 1378 (Ala. 1993) for the proposition that "some of the pertinent duty considerations include: (1) the nature of the defendant's activity; (2) the relationship between the parties; and (3) the type of injury or harm threatened." In this case, there is no question that the plaintiff had the greater experience in the subject area of work and agreed to have someone with knowledge on the job. There was no evidence that the defendant failed to heed any specific construction suggestion by the plaintiff. There is evidence that in some instances in which it followed the instructions, there were problems.

## Damages

The court finds that the defendant had completed 78% of the work at the time the plaintiff failed to substantially perform. Based on the progress payment schedule, this meant that the defendant at the time of the termination was entitled to 10%, plus 20%, plus 20%, plus 20% of the contract price or 70% in progress payments which totals $69,020.00. Because of the substantial failure of plaintiff, the defendant is also entitled to recover the additional 8% ($7,888.00) making a total of $76,908.00. Of this amount, $29,580.00 had been paid by the plaintiff to the defendant, leaving a balance due of $47,328.00. Further, the plaintiff owes the defendant $3,000.00 for the spreaders and clamps. Further, the court will allow the defendant an additional $5,000.00 for delays caused by the plaintiff, including the cherry picker problems, the clips problems and the bolt problems. Any other, if any, delays caused by plaintiff are offset by the torque problems.[1]

The court will enter a judgment under which the plaintiff will recover nothing on its claim and the defendant will recover $55,328.00 on its claim against the plaintiff.

This the 21st day of July, 2001.

ROBERT B. PROPST
**SENIOR UNITED STATES DISTRICT JUDGE**

---

[1] Any delays were less costly to the plaintiff than to the defendant.

9